Case No. 16-1014, Louisiana Public Service Commission Petitioner v. Federal Energy Regulatory Commission. Ms. Baldwin for the petitioner, Ms. Banta for the respondent, and Mr. Strain for the intervener. May it please the Court, my name is Mike Fontham. I represent the Louisiana Public Service Commission. The energy bandwidth tariff was created by FERC to end undue discrimination on the energy system by making sure that the production costs, the cost of generating electricity, of each of the energy operating companies would be brought within a bandwidth setting the outer limit of due discrimination of plus or minus 11%. That requires that the costs be added up. The costs are supposed to be calculated according to FERC accounting regulations recorded in FERC accounts and reported in the FERC Form 1. In this case, because energy has followed the practice of recording retail depreciation rates that were set many decades ago, that are grossly disparate, grossly inconsistent, all of the evidence shows this, the bandwidth calculation is distorted. It is not an answer to say that the nature of the tariff, which is a tariff to end undue discrimination, permits the perpetuation of undue discrimination. Can I ask, was there evidence that the disparate depreciation rates materially affected the production costs? Oh, yes, Your Honor. What was the evidence about how much of a difference in production costs there was between one state and another? The energy was required by an administrative law judge to perform new studies. Those new studies then became one basis for our case here. There is a calculation by FERC staff witness, Pete Puterbaugh, on the joint appendix at 1039. It's also cited in our brief, Your Honor. The differences in the depreciation, for instance, for— No, I'm not—I appreciate there's difference in depreciation. But the question I'm asking about, is there a difference in the production costs as a material difference? I take it depreciation is only one part of the costs, right? That's true, but it's a dollar-for-dollar calculation. In other words, the depreciation that goes in raises the total cost of the company by that amount of dollars. It does, but I take it the question of whether it's material is what percentage of the total cost. Correct, Your Honor, and I'm trying to get there. Okay. The difference in Louisiana was over $40 million. That's 3 or 4 percent of production of the average. Forty million above the average. Forty million above what it should have been, which would have raised Energy Louisiana's production costs approximately 4 percent. There's a balancing calculation. I'm just—I know you have multiple arguments. I'm trying to focus on just one, Your Honor. And I'm trying to get there, but the point is that when you put in the calculation of the cost, Louisiana was approximately $40 million in excess. In excess, you're talking about $40 million more than in Arkansas? Forty million more than Louisiana should have been under the FERC regulation. That's a different question than I'm asking, so just bear with me. Okay. My question is the overall problem, as I understand it, is that there's supposed to be roughly equal production costs. That is, I would say not materially significantly different production costs between the states, between the— Yes, sir. That's right, right? That's the bottom line. But there's a standard, and that's plus or minus 11 percent. My first question is just a fact question. Yes, sir. How much more were the depreciation rates costs in Louisiana than in any other state? Not compared to the FERC rates, but just compared to the state rates in the other states. Well, the evidence showed that, say, for nuclear plants as an example, the difference between establishing it correctly in Arkansas and Louisiana and what was actually done, because Arkansas was faster than it should have been. Louisiana was slower than it should have been. The total difference was about $60 million. Can I ask you a pause? Can I ask you a pause again? You keep saying, as compared to what it should have been, and that's not the question I'm asking. Okay. I just want to know, how much different were the Louisiana costs based on the Louisiana state depreciation rates compared to the Arkansas costs based on the Arkansas depreciation rates? Your Honor, you're asking me a question that is very hard to answer for this reason. The Louisiana nuclear plants cost $3 billion and $4 billion. If you depreciate that over the service life, the depreciation is several hundred million dollars. The Arkansas plants cost $300 million only and $900 million only. So if you depreciate that on the wrong service life, the difference is, you know, maybe 30. It's a lot less per year. So to say that one investment of $3 billion is higher, lower, or whatever, than another investment of $300 million as it's being depreciated is very hard to do, which is why the FERC standard simply says what it should be is the amount of the investment allocated over the service life of the unit, which determines what the correct amount should be. So in the calculation, you're winding up. The companies were brought to the plus or minus 11% standard. But if the depreciation had been correct, there would have been much higher payments to bring them to within the plus or minus 11% standard. So the particular calculation you're asking for was not made in the record. The data is there to tell how far, you know, in percentages for each company, it throws off their production cost calculation, and therefore how much it would affect the differences after they're brought to plus or minus 11. So are you saying that your argument depends, then, on our agreeing that the FERC rates have to be the rates they apply? If we were to agree that the state rates were acceptable, then you wouldn't have the additional argument about the allocation of production costs. If you had a good reason why the state rates were acceptable, in other words, if FERC explained it. But to say, if you look at the opinions, it's our regulations don't always apply, but they do always apply except for this case. Just to be clear, then, your argument depends on our agreeing with you that the FERC rates are the ones that have to apply. You don't have an independent argument for which you submitted data that if we relied on the state rates, there would be a misallocation of the quality of production costs based on that data. I think that's right. Okay. However, as I was trying to say, I think that our argument is they haven't explained it. You know, how can the state rates apply in a FERC tariff? And, Your Honor, it's not like the states all adopted the same method. They all adopted different methods. So you have five different methods affecting a cost allocation tariff at FERC. And if you go back, Your Honor, to Judge Edwards who was in the Middle South Energy case, and, you know, this court cited, FERC is supposed to be the one exercising jurisdiction in this kind of a case. Why? Because you don't want the states trying to up the ante. Louisiana could have gotten more payments from Arkansas by raising the depreciation. And the evidence in the record shows that Arkansas did exactly that to lower its payments. But, Your Honor, how can it possibly be a reason to, you know, perpetuate undue discrimination to say, well, it's the nature of the tariff that allows it? The suit was about changing the tariff. Is your fundamental dispute with the bandwidth agreement, with the formula that was come up with there? Because it didn't nail this down, right? It didn't say you have to use the FERC. Well, Your Honor, the language on depreciation was borrowed from a different tariff. That said, set by retail regulators unless FERC determines otherwise. That's right. Now, if the retail regulator said it right, it would be fine to use it. But FERC in all other cases has said, if it's not according to our standards, we're going to change it. You have to file it. We have to approve it. Is there a different value here? I mean, you keep using as a baseline for which we should compare this case FERC regulating a power plant. And that's not what's going on here. What we have here is we have FERC trying to enforce a system agreement, right? And that's a different inquiry. It's trying to enforce an undue discrimination requirement that it put into the system agreement. And the system agreement did not have that. FERC, in Opinion 480, ordered that it happen. And when that case was handled, we said, well, there are a bunch of disallowances in Arkansas, and we should take credit for those in the calculation. The answer was, oh, no. You have to use a consistent methodology, and that's the FERC account. And we, in the case of their Grand Gulf costs as an example, they had a huge disallowance in Arkansas. And we said, well, the rate payers aren't paying that. Why should Arkansas get credit for that? And the answer was, well, because energy has the cost on its books. And we're going to do a per books calculation. And if you look at the ALJ decision in that case, it's how do we get it consistent. And if you look at Opinion 514, you'll see that FERC decided what happens at retail is irrelevant. There was a question of whether a Louisiana adjustment should be reflected in the bandwidth tariff. And FERC said, and this is in our brief, but FERC said, this is not about what the retail regulators do. This is about what should properly be recorded on energy's FERC accounts. So that is universal except for depreciation. Another example. So it's your argument that when the system agreement was established and allowed for use of retail, that that was the original sin here? I mean, that allowed what you now would consider gaming and mischief to come in? Well, first of all, the depreciation didn't have the effect it has had since the bandwidth tariff came about. But the utility practice was to use retail until Order 618 came out. And Order 618 said, basically, we're exercising plenary jurisdiction now, and you have to follow our rule in your accounts. And that rule wasn't all that arduous. It said, systematic and rational over the service life. So as long as a state is systematic and rational over the service life, it can go in there. But if it's not, it's not supposed to be recorded. And if energy ever lets it get into a rate or any utility, FERC says, we're going to review it and make sure it complies. So from 2000 forward, it was supposed to be the FERC regulation. Energy did not change. Energy continued to use the retail. Well, as of 2000, some of them might have been right. I know the Arkansas nuclear depreciation was right as of 1999. They extended the service lives after that. So anyway, it didn't really come up until the 2007 case when all of a sudden we see this depreciation and the bandwidth tariff, and it's wildly, grossly disproportionate, as the judge held. And this whole idea that Arkansas can use a faster depreciation rate, which has the effect of exporting future depreciation costs to the other states through the bandwidth, the judge said, you can't do that. FERC has to set the depreciation. So we're still back right now to FERC say, and, you know, I would like to emphasize, I know the court knows this, but for the first five years, FERC said, we're going to set the depreciation and the bandwidth tariff. There's an Arkansas case where they tried to remove the unless language out of the tariff. And FERC said, no, we've got to do that. Three judges said, no, FERC has to do that. It didn't come about until 2011 when all of a sudden FERC said, oh, we're going to interpret the tariff to require us to use retail. And then in this case, we're saying, okay, change it. And they say, well, it's always been in there that we've got to use retail. That's completely circular in a case to change the tariff. You know, when you get down to the actual basis of all this, it's that the depreciation is wrong. Their expert said it. Our expert said it. The FERC staff expert said it. They said it's wrong by tens of millions of dollars. And the FERC staff witness said, a different staff witness, that's distorting the bandwidth calculation. It cannot work. Our witness said that. No one refuted it. There is no evidence whatsoever refuting that. The, you know, and so FERC falls back on the nature of the tariff, respecting state settled interest. What the heck is the state settled interest in undue discrimination? Or in having Arkansas set Louisiana, set a FERC tariff cost that winds up in Louisiana rates. What is the state settled interest there? And, you know, all of the arguments are circular. Well, it's our policy to apply retail, therefore we have to apply retail. Without any confrontation of the evidence in this case, any at all. Your Honors, I suppose I can rest on my brief on the delegation. I know I'm out of time, but I'm happy to address that as well. Well, we'll give you a little time for rebuttal. You're out of time. Thank you, Your Honor. Good morning. Carol Banton for the commission. I'll start by taking a step back and focusing on what's actually before the court and what's not. Bandwidth formula in its current form, with the reference to the depreciation rates, is the existing filed rate as this court held in 2015. Fifth Circuit held it twice, I think, in 2014. The interpretation of the unless clauses and the interpretation of that tariff as incorporating the retail rates was squarely presented in opinion 514 from the second bandwidth proceeding in the Fifth Circuit, and it was upheld as a reasonable interpretation. That's not before this court either. The clarification of the commission's interpretation, which happened either in 2010 or 2011, depending which order you look at, Louisiana in various cases has taken the position that it's whichever case is before the court. The Fifth Circuit twice, in the second and third bandwidth proceedings, held that that clarification, the commission, the Fifth Circuit characterized it as a change in direction, which is not how the commission had characterized it, but that's fine. The Fifth Circuit twice found that that was reasonable, it was explained, it was not arbitrary and capricious, and it was followed consistently after that. Are you saying that the Fifth Circuit's decisions are collateral estoppel here, or what? I think, yeah, I think we would use that term. Here we have a situation where at any given time there are about a half dozen different overlapping proceedings pending before the commission, and the timeline that we have in our identical cases and at the back of our brief is just a flavor of that. I left a lot of them out. But what you can see in that timeline is that a lot of decisions from different proceedings were clumped on the same dates, the second bandwidth, third, fourth. The commission would issue them on the same dates, and it would answer. The parties raised the same issues in nearly every proceeding, and the commission would often answer it and try to be consistent in doing it the same way. Almost all of those cases have been or will be appealed, either to this case or the Fifth Circuit. So I guess the question becomes if the same issues are raised in every proceeding and the commission speaks to them in all of the orders, how many bites of the apple does any litigate get? So while this court may not be bound precisely by the Fifth Circuit, between this court and the Fifth Circuit, all of these issues will be litigated at least once. But in particular, Opinion 514, which is the 2011 decision that counsel referred to, that was the one that was directly in front of the Fifth Circuit. So I would say that would be a collateral attack on the Fifth Circuit's ability to revisit the questions. But that's the 2014 decision? We called it 2014-1 because there were actually two. August 1, 2014. Decision of which? 761F3. Yes, that's the one I'm thinking of. And then proceeding 771F3, which covered a lot of the same ground. But that one seems to depend on understanding that FERC was going to continue oversight in a Section 206 proceeding, which is this one, right? Absolutely. Yes. So if we were to think that you had not appropriately provided that oversight, then the Fifth Circuit's decision would not bind us in any way because it was dependent on belief that you would. On subdelegation, I'm just saying that the existing filed rate, which actually this Court has said it's the existing filed rate. It always had the depreciation in there. The interpretation, I think, is separate. The Fifth Circuit treated it separately from the subdelegation argument as a tariff interpretation. They didn't even necessarily give a Chevron deference as this Court would. They said we could have the technical deference. They said even if we didn't get any deference at all, the interpretation was still reasonable. So I'm just saying that the existing filed rate incorporates the retail depreciation rates in the production cost comparison. And the unless clauses, the Commission said, will only invoke those when there are some wholesale rates. Let me explain what this means. In the comparison done each year of the actual production costs of these, at different times, five or six different companies operating in, I believe, four different retail jurisdictions. The bandwidth formula takes the actual production costs of, and that means the cost of providing retail service, in fact, most of its retail service, rather than wholesale service. I believe that Entergy Arkansas was the only one that had any significant wholesale service.  So the formula was always intended to take a look at the actual production costs, and it considered the retail rates or the retail depreciation numbers. Those are what the different retail jurisdictions are basing their own retail service rate makings on. Council says that the Commission never explained what it meant by the nature or the history. We have many sites for that, but I think the best one I want to point you to right now is at the end of Opinion 514A. It's at JA 215 and 216, and particularly paragraph 54, where the Commission is talking about why the history matters. And it cites, specifically in paragraphs 91, 92, and 93, to the original bandwidth opinions in 480, 488. That's what this court had in front of you in 2008, approving the creation of this remedy. And it cites to this court's 2008 decision. In Opinion 480, where the Commission was looking at the data from the proceeding, Entergy put in these studies based on 2002 data. So if it matters, that's actually a year after one of these licensed lives in Arkansas was extended. But it was 2002 data that in 2005 the Commission used to find this 30% or whatever disparity that motivated the 11% bandwidth. The Commission looked at the history and found that since the Grand Gulf reallocation in the Mississippi Industries case, the allocations of the companies had remained within about 22% of each other until the early 2000s when coal and gas prices diverged significantly. So the Commission based the 11% remedy that this court affirmed on historical data that was based on different state data, including the state retail rates that were used in that study to begin with. So then that was put into the formula that was adopted in 2006-2007, and that is the existing filed rate. So what the Commission is pointing to in paragraph 54, it's pointing to where did this remedy come from, how did we decide it was needed, how did we decide it should be set up. The Commission and this court talked about that. Can I ask you a question? We're running sort of out of time, so I have a few questions for you. The first one is I understand the Fifth Circuit's decision. It's about the meaning of the agreement and what would be in the agreement. This case is about whether the consequences is unjust and unreasonable, right? Yes. And that wasn't decided by the Fifth Circuit? No. Okay. And then that goes to the problem of what Louisiana failed to show. Okay. I'm sorry. Now we're getting to that question. Yes. If Louisiana could show that using the state retail rates led to materially unequal allocation of overall production costs, would the Commission conclude that using them, at least in those cases, was unjust and unreasonable? Well, I think the production costs among the states were often unequal. I think the answer is no. I think the Commission said that. . . Isn't the point of the agreement that the production costs are supposed to be within the bandwidths? No, they're brought within the bandwidths by the payments, and that happens. Yeah. Right. But if they're not, if they were materially unequal, the purpose, I thought, was to render production costs equal, right? Roughly equal. Roughly equal. Right. What if it doesn't render them roughly equal? Well, I think maybe what we're arguing about is the definition of roughly equal. I'm not arguing. I'm asking you a question. No, what we're arguing about is the definition of roughly equal. Yeah. Because the Commission, and this goes back to what I was meandering a bit about, the state interests and the balancing act that this Court. . . I want to leave the balancing act out for a moment, okay? Okay. I just want to focus on whether grossly indifferent state retail depreciation rates would ever be inconsistent with the principle of establishing roughly equal production costs. Yes. But, yes. And is your argument that they just didn't put in any evidence on that question? They put in evidence about differences in depreciation rates, but not about consequentially grossly unequal production costs. Is that right? Yes. And that's what the Commission was getting at in the first, in 519, in paragraph 44, J.A. 27. The Louisiana Commission came in. . . The Commission said, we're not going to look at the formula as if it were a tabula rasa, a typical wholesale rate with no prior history and no particular remedial function. Louisiana came in saying, these rates are different than what you would set for a wholesale rate. Therefore, they're obviously unjust and unreasonable. And the Commission said, well, no, we don't agree with that. They said, Louisiana came in and said, obviously the depreciation rates have to be uniform across all the states or you can't make a comparison. And the Commission said, no, that doesn't look at how we started this remedy. It doesn't look at what the remedy is intended to do. And the reason that the Commission found it was not inherently unjust and unreasonable to have different retail depreciation rates incorporated is because, I know I keep going back to the state settled interest because I want to explain it. It's not unexplained. But would the state's unsettled interest overcome grossly disproportionate rates, production costs? No. And I should make two very important points. Just answer my question for a second. Leaving aside your reasoning for why you use state depreciation rates, if using them led to undermining the principle of rough production cost equalization, would you, in a particular case, continue to use them? Is your argument in this case that they just didn't show that? They showed at the most different depreciation rates but not unequal production costs? I believe that's right. Okay. Now we can get to the next question, which is about settled expectations, et cetera. Why is it in the settled expectation? What does that mean when the consequence of, say, applying Arkansas' useful life numbers leads to an effect on costs in Louisiana? I appreciate that might settle Arkansas' settled interest, but it certainly doesn't settle Louisiana's settled interest. That's not the settled interest that the Commission. And what is the settled interest? And that's why I was starting with Paragraph 54 and the cites to the original bandwidth proceeding, because what the Commission discussed in 480 and 488 in particular is that we're coming in. It was partly in the discussion of full production cost equalization. Just tell me, what is the settled interest that we're talking about? That the states have an interest in their – we're talking about generation costs. We're talking about retail regulation. And the Commission said it would be a huge disruption to the state's role in regulating their own retail production costs for what's largely retail service. This is a formula that the Commission adopted under its jurisdiction of affecting rates. Does the state regulate its own retail production costs or just the ultimate rates that can be charged to consumers? Well, to be specific, it decides its own retail depreciation rates. Which, again, lead to cost charges that can be made to the consumers. Is that right? Is that the point? Yes. I mean, they set them in there. These are depreciation rates that their own retail customers would be. So is there anything that would prevent them from using those retail rates for charging consumers while using FERC rates for the overall system agreement? Prevent? Well, the Commission made the policy. Prevent Arkansas from continuing to use state rates in determining how much a state utility could charge its consumers. No, those rates have to be the same. The bandwidth formula incorporates the actual state depreciation rates. I know. If it didn't. If it didn't. If instead we followed the plaintiff's claim here and accepted it, that for purposes of the system agreement we use the FERC rate, okay? What they described as the FERC accounting. Would that prevent the state from using its depreciation rates for something else? I don't know the answer either. No, it wouldn't. But it would change the nature of the bandwidth remedy. And the Commission chose not to go that far in intruding. It was dealing with production costs that are generation costs, which is why I mentioned the affecting rates jurisdiction rather than setting a wholesale rate. It's looking at a multi-state system with a lot of different interests and saying, what's our way to look at this? And again, the remedy was built on a comparison of state, multi-state data. So that's what went into the formula. How do you respond to the argument that allowing it to proceed that way creates opportunities for mischief? Well, I would say, first of all, that the ALJ and the Commission both affirmatively made findings that there had not been manipulation or that it had not been shown. And that is at around 115 and 118 of Order 519 and, I believe, 37 to 42. Certainly the opportunity exists, though, right? I think the Commission said, and one point I didn't get to earlier. Whereas it wouldn't exist using the FERC rates, right? So I do want to point out that the Commission also made the finding that just because Arkansas – this is not a case where Arkansas put in new depreciation rates that do something crazy like a 10-year or an accelerated. The Commission found these are just – they just didn't immediately update them. The Commission said, I think, pair of 39 and 519A is a good place to point out. Retail regulators have different reasons for updating depreciation studies when they do. These were just old studies that no one disputes were fine when they were done. They were based on a 40-year survey. Could you explain for me again, because I didn't quite follow. What is the state's interest here? What is the settled expectation of the state? That refers to the fact that when the Commission was deciding whether to do full production cost equalization or RUF, it said we're going to make it RUF because this is already an intrusion on the states. So incorporating state data – and again, I go back to the fact that the entire remedy was premised on studies that had been done using these different state costs. The Commission said RUF equalization – So it had been done that way in the past, right? Well, it was done in the 2002 study that Entergy put in that became the basis not only for finding a 30% disparity but for imposing. Would the states in some way be disadvantaged or harmed if FERC decided, no, we're going to use the FERC rate for here? I think what the Commission has said is it would be a change to our approach and the way we've treated the states, and it would be what the Commission has referred to as reconstructed inputs. It wouldn't be actual data. It would be tweaking the numbers to make an imaginary comparison of what the numbers would have been rather than what are they actually? What are the facts on the ground in these different states? It's not comparing apples to oranges, but maybe it's comparing different kinds of apples. I mean, these different states do have different data. So your answer to the mischief question is that the Commission will just look at that when the case arises and we'll take care of it then? Well, and it looked at it here. And it also specifically said even though these rates were not promptly updated with the new service lives, they were systematic and rational. They were straight-line depreciation over a service life that was valid when those rates were adopted. So the Commission made those findings. So again, if you came in and showed a state that suddenly changed its depreciation rates to something weird, I mean, this opinion doesn't cut back down. What does the Commission mean when it says that using the state depreciation formulas reflects the actual depreciation? What does that mean? That means those are the... And the actual production costs. Actual production costs are defined as the numbers that are on the various operating companies' actual books. So that doesn't really mean actual in the normal use of the word in English. This is an accounting convention. I guess so. But it means it's not being manipulated by the Commission to make some kind of artificial comparison. Fine. But it's an accounting convention. And I take it FERC's accounting convention is also an accounting convention, right? Yes. So what's the difference when they say why is using the state better because it uses actual production costs? Well, I don't know if it's better. The Commission found it more appropriate as a policy judgment. But I don't understand what the actual part of it, how that makes it more appropriate as a policy judgment. Isn't FERC just saying it's closer to the ground to let the states determine the depreciation? Yes, and I also... It's got to pass muster in the state. Yes. That's closer to the ground. It could be determined in even a number of places. And they're saying let the state make that determination. There are going to be some variations, and we take account of that. That's the formula. I mean, there's nothing more or less than that, right? Well, I would add to that an efficiency and efficiency, not inefficiency, in that the Commission... First of all, the Commission said if we ordered full production cost equalization, everybody would be litigating in each other's retail commissions. No, you're making it too complicated, I think. Okay. It's a rough justice notion. So the question is where do you go to get the number? That's right. Percis said the states are closer to this number. These places are in their bailiwick. They deal with this all the time. These are the decisions they're making for their... And unless they're playing games, we're going to accept their number because the alternative would be us trying to come up with what? Something different. That's essential. At least that's what I was reading. Percis, what do you want us to do? What is... Should we say X kind of plant always depreciates at X years? And what sense does that make? No, and that's when the Commission said retail regulators have reasons for not updating their rates immediately. That goes to the same thing. FERC does have a rate that it uses, doesn't it, for wholesale depreciation. Am I wrong about that? It has a policy. It does judge on a case-by-case basis, but it does have policies. It does what, wouldn't you say? It does judge on a case-by-case basis, but it does have policies. And does it always use the state numbers, does it? Well, certainly not in setting a wholesale rate. But that's the distinction that the Commission was making in several of the orders here between setting a traditional wholesale rate for power sales versus a rough equalization of what are essentially generation costs that are in our jurisdiction because they affect rates within our jurisdiction. Okay, they affect what rates? Oh, well, the allocation under the rough production cost is flowed through to rate pairs. So I don't remember the details. I know in both Mississippi Industries and this court's 2008 decision, the basis for jurisdiction over these cost allocations among the companies was the affecting rates rather than the – it was the affecting rates part of the jurisdictional statute. The Commission noted that in one of the orders. I can give you the site if you – Further questions? No. Thank you. Thank you. I know that the petitioner is out of time. Uh-oh, I'm sorry, we have an intervener. Sorry, I apologize. Go ahead. I may have pleased the court. I'm Mark Strain for Entergy. As Ms. Banta referenced, the FERC has taken this matter up now many, many times. Seven dockets, 12 different opinions. FERC has looked at the same issue and come to the same conclusion, that this tariff requires the use of the retail regulator-set appreciation rates expense and that it's reasonable to do that. They've been very consistent with that and the Fifth Circuit agreed. The LPSC has continued to argue in case after case that these depreciation rates cannot form the basis for the actual cost included in the bandwidth calculations. These are the same rates, these erroneous rates, that the LPSC uses to set retail rates in Louisiana. They say that FERC is arbitrary and capricious and unreasonable by doing that, but the LPSC relies on the same rates, and they have had before them the updated rates for many years now and have chosen not to update retail rates to reflect these updated depreciation rates. Judge Griffith, you talk about mischief and the potential for manipulation. Well, I think there's potential for manipulation the other way as well. If the retail regulator is keeping retail rates artificially low by adopting an extended depreciation period, and then they go to the FERC and we get bandwidth payments that are based upon an assumption, a hypothetical assumption that those retail rate payers are paying something much higher, that's not fair. That's potential mischief there. And so FERC wisely decided for purposes of that component of this tariff, and this is a very unique tariff, you have to agree. I think you've all dealt with it at one point or another in cases here. It's very unique. It's very, very technical. The depreciation components are extremely technical, and FERC in exercising its discretion, relying upon its technical expertise, has decided that for the purpose of these annual proceedings, we are going to rely upon the state regulator-determined rates. That gives us a common ground to do that. That way each year we're not having to come in here and recalculate new depreciation based on new updated rates and creating hypothetical costs for comparison. It's our view that based upon the uniqueness of this tariff, you should allow deference to FERC and its expertise. It has exercised that deference or that discretion, as I said, now 12 times consistently. I think we're out of time. Let me just ask if any of the judges have questions. Thank you. We'll give you another two minutes. We'll let the other side go over as well. I'd like to answer, Judge. First of all, with regard to this rough justice idea, the rough justice idea was built into plus or minus 11%. If there is an accounting error of $500,000, FERC changes the account and takes out the $500,000 in an annual proceeding. It does not say, oh, well, it's still rough justice. You have to come exactly to plus or minus 11%. If you're half a million off, a million off, two million off, and it's accounting, an error of accounting under FERC regulations, they change it. So it is not a rough justice kind of an argument. I just don't understand where they get you in this rough justice. Well, Your Honor. Let me tell you the question before you start answering it. They're saying we're going to look for actual meaning of what the states are doing over there. You know, because otherwise it's possibly arbitrary for us. So we're going to do that. But we realize the variance can be too great. So this plus or minus 11 is the protection against that. So what? What's wrong with that? What am I missing? This takes you beyond plus or minus 11. It takes you well beyond plus or minus 11. That's the first thing. The second thing is that they don't do that for anything else. I don't know. I just don't understand why that would carry the day. I mean, if something is not unreasonable on its face, if it's a different approach. This whole agreement is different. If it's different from other arrangements. You can't win on that alone just because this is different from other arrangements. It's made appropriate for this arrangement. That's not what I'm relying on at all. What do you mean? Every other wholesale tariff, you have to follow the FERC regulation on depreciation. Every one that exists. The cost equalization tariff for service schedule MSS-1, you have to. The cost equalization tariff for service schedule MSS-2. In the energy system agreement, you have to. The transmission agreement. On the wholesale? Well, if those are cost equalization, this is a wholesale tariff. I understand, but it incorporates a retail component. And so do all the other wholesale tariffs. They incorporate transmission costs that are regulated at retail. When you make a power sales agreement, your generating unit is in the retail. No, no, no. I mean, for what it's worth, I'm just telling you to respond if you want. It doesn't sell to me that you say this is different from other things that we're looking at. That doesn't make it inherently unreasonable. Your Honor, I'm not the one that's saying it's different. I'm the one that's saying it should be the same. I understand, but that's saying it. No, that's saying it is different and, therefore, it's unreasonable. That doesn't follow to me. I'm saying, well, if you have every cost that goes into the tariff has to follow the FERC regulation, and this is the one cost that does not have to follow the FERC regulation, that's different. I agree that's different. But all I'm saying is it should be the same. If they're going to have a standard that you use a FERC accounting data, then they should have a standard that says you use a FERC accounting data. And if I show, which I did, that the retail accounting data defeats the purpose of the tariff, then they should either fix it or they should explain why. Mr. Fraulein, you heard your opponent's response to my question about the mischief that may be built into this. What is your reply? Your Honor, the evidence that we reviewed was never disputed. The evidence that we reviewed was testified to by energy officials. They testified that they made a study that Arkansas could export $500 million of future depreciation if they kept the Arkansas Nuclear One depreciation the same after the life extension instead of changing it. They went to the Arkansas Commission and they said, okay, we're going to leave it the same, please don't review depreciation. This was all undisputed and it's undisputed in the record in this case. The FERC staff witness way back when in 2007 alleged that they had manipulated the tariff. Arkansas Public Service Commission had manipulated the tariff. It's clear that energy did. Then the Arkansas Public Service Commission had a fit and moved to strike his testimony and he withdrew that it was a manipulation. He didn't withdraw any of the rest of it and he changed to there's a potential for manipulation. FERC later ruled that all of that unrebutted evidence doesn't show manipulation by the Arkansas Public Service Commission. But there was manipulation. I can't do anything about it. It's a ruling and I think the Fifth Circuit said there was nothing wrong with the ruling. But it is an undisputed fact. Can I ask about the arguments that you make about the need to use state? The argument that you make about the need to use the FERC accounting rate rather than the state, isn't that the same argument you made in the Fifth Circuit? No. Well, on the delegation, yes. No, on the question of which kind of depreciation rate should be used. No. What the argument in the Fifth Circuit was, look, they sent us to the annual bandwidth cases. They dismissed our complaint in 2008. We won before the first judge. We won before the second judge. We won before the third judge. And then they issue a ruling that says, oh, you're in the wrong forum. You have to file a complaint. The Fifth Circuit affirmed that, the change of course, as the Fifth Circuit said. And the change of course was based on a reinterpretation of the language in the tariff. They had interpreted it to say that they had jurisdiction and should and would adjust the depreciation. But in that case that went before the Fifth Circuit, they said, no, the language means we can't do it. So you have to file a complaint. So we, in our complaint, said, okay, we'd like to change the tariff. And then the first bandwidth proceeding, which had been obeyed, came before this court. Judge Edwards was on that panel. And the panel said, you're in the wrong forum. Your complaint case is the right forum to try to do something about this. So here we are in the complaint case, and they say, oh, this has already been litigated. What about the subdelegation argument? The subdelegation, Your Honor, is simply this. No, no. Is it not the same argument that was rejected in the Fifth Circuit? It has some of the same elements. But that was according to FERC. I mean, according to the Fifth Circuit, FERC was going to decide whether the bandwidth tariff justly and reasonably allocated the production costs. So it was exercising discretion. Now FERC has said, we don't care what the evidence is. That's not how I understand what they're describing their argument about. Their argument is if it shows unjust and reasonableness with respect to the overall production cost. There is absolutely nothing in those orders that says that, Your Honor. There is no attempt to show that this is not a distortion. None whatsoever. They do say we didn't carry our burden of proof, but they don't say how. But I thought you told me that you didn't have evidence in the record on that issue. No, Your Honor. Your Honor, I have in the record that anything incorrect about the depreciation takes you beyond plus or minus 11%. You have to have a consistent calculation. That's in the record. The question that you asked me was, can you compare the depreciation cost on a $3 billion, I added this, a $3 billion nuclear unit to a $300 million nuclear unit? I can't. I mean, no, you can. But you can say that the investment has to be allocated over the service line in a systematic manner. What you're saying is by comparison to the FERC accounting rate. Is that what you're saying? By comparison. You put in evidence comparing the state rate with the FERC accounting rate. And with energy's depreciation study, which was done in 2000. But not comparing the different state rates. Comparing the different state rates to the rates in energy's depreciation study, which was largely supported by our expert and the FERC staff expert. The rates are grossly disparate. 74 of the units have the wrong service life in the existing rates. 74 out of 75 would have to be changed under energy's new studies. I think we have the argument. Is there any further questions from either of the other judges? Thank you, Your Honor. Appreciate it.
judges: Garland, Griffith, Edwards